## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**KIT-YIN SNYDER AND RICHARD HAAS,**

      Plaintiffs,

v.                                                    Case No. 1:22-cv-3873

**ERIC ADAMS**, Mayor of the City of New        **COMPLAINT**
York, in his official capacity, **THE CITY OF
NEW YORK, NEW YORK CITY
DEPARTMENT OF DESIGN AND
CONSTRUCTION, NEW YORK CITY
DEPARTMENT OF CULTURAL
AFFAIRS, NEW YORK CITY
DEPARTMENT OF CORRECTION, NEW
YORK CITY PUBLIC DESIGN
COMMISSION,**

                                                      **JURY DEMAND**

      Defendants.

## INTRODUCTION

    1.    Before the Court are two world renowned contemporary American artists,

Plaintiff Kit-Yin Snyder ("Snyder") and Plaintiff Richard Haas ("Haas," together,

"Plaintiffs") who seek to protect their collaborative art installations at the Manhattan

Detention Complex in Chinatown, some of their most significant works of public art.

Plaintiffs' works of art are in immediate peril of destruction, and this action for

declaratory relief is Plaintiffs' last resort to save their works of art for the public's

continued enjoyment.  Plaintiffs hereby bring this Complaint to protect their artists' rights

of integrity, pursuant to the Visual Artists Rights Act ("VARA"), 17 U.S.C. § 160A.

2.     In 1985, when using tax payer dollars, Defendant New York City ("New York City" or "City") commissioned artwork from Plaintiffs for the public space between the North and South towers of the Manhattan Detention Complex in Chinatown, to be created in joint collaboration.

3.     The design, planning, and implementation of the artwork spanned over more than seven years.  Snyder and Haas created sculptural friezes along the bridge adjoining the North and South towers of the Manhattan Detention Complex, "Solomon's Throne" atop of the bridge, painted murals adorning the walls of the Manhattan Detention Complex, seven freestanding columns surrounding the Manhattan Detention Complex's entrance, a geometric labyrinth of colored pavers on the ground in front of the Manhattan Detention Complex, and two rows of apple trees bordering White Street.  The resulting artwork represents the immigrant communities of the Lower East Side, illustrates overlapping cultures, at a site adjacent to the 'melting pot' of immigrant communities residing on the Lower East Side, and conveys a desire of justice for all those being detained in the Manhattan Detention Complex.

4.     Chinatown has long been a home for immigrant communities, and since Plaintiffs' completion of the artwork at the Manhattan Detention Complex in the 1990s, the artwork has served as a reminder of the waves of the cultural significance of the community.  The work is treasured by the community and was awarded the Art Commission Award for Excellence in Design in 1988.

5.     Despite the significant value of the works, today, Plaintiffs' works of art are imminently threatened with demolition in the face of plans to destroy the existing

Manhattan Detention Complex and create a new Manhattan Detention Facility ("New Facility").  In October 2019, the New York City Council approved of the controversial Borough Based Jail ("BBJ") Project which calls for the replacement of Rikers Island with four new detention facilities in the Bronx, Brooklyn, Manhattan, and Queens.  In order to accommodate the BBJ Project, the New Facility will be constructed.  This plan, which is strongly opposed by members of the Chinatown community, will have immediate and very long term, wide-ranging impacts on the Chinatown community and the character of the neighborhood.  The plan will cause irreparable damage to the community's economic viability, architectural design, and health conditions.  Most pertinent to this suit, Plaintiffs' valuable works of public art will be obliterated.

6.      By removing Plaintiffs' works of art from their location in the areas surrounding the Manhattan Detention Complex, the works of art will be deprived of the context in which they are situated, thus obliterating the cultural value of the artwork. Without the context of the geographical location in which the works are installed, the vision depicted by Plaintiffs' work will be incomplete and the immigrant struggle and wish for justice that are depicted in the works will lose their value.

7.      This threat of the demolition of culturally significant works of art in the Chinatown community is only the most recent attack in a history of threats of demolition, dispossession, and inappropriate development that the residents of Chinatown have endured since its establishment in the 1870s to the present.  Indeed, when the City first constructed the Manhattan Detention Complex over the objection of the neighborhood residents in Chinatown, in return the City promised that White Street between Centre and

Baxter Streets would be a pedestrian only public plaza.  The City now breaks its promise and attempts to destroy that same public plaza, and the public art that resides therein, in the name of constructing a skyscraper detention facility in Chinatown.

8.      During a press conference on April 2, 2021, Mayor Eric Adams himself has acknowledged the particularly destructive impact of the plans for the destruction of the Manhattan Detention Complex and Plaintiffs' works of art on the Chinatown community, stating:

> "This community has done its share, it has done its job. It has already been traumatized for years and years over and over again. And so by placing a skyscraper of a correctional institution in this community is only going to continue to overshadow the voice of the everyday New Yorkers are in this community… If we want to stop the thoughtlessness that goes into what this community has experienced with the recent levels of hate crimes, Let's stop the institutionalizing of their hate that we're seeing in government. So I join them today in saying, No building up a jail in this location… I know it's possible to solve the problems we are facing in incarceration without the destruction of communities…"[1]

9.      In the face of immediate destruction of their works of art, Plaintiffs now must act to protect their rights of integrity in their art, as well as to ensure that public artwork which depicts the history of our community and is culturally significant to Chinatown is not mutilated and destroyed.

10.      In light of the foregoing, Plaintiffs Kit-Yin Snyder and Richard Haas, for their individual claims against Eric Adams, The Mayor of the City of New York, in his official capacity, The City Of New York, New York City Department Of Design And

---

[1] A video of Mayor Adams' speech is available on YouTube through the following link: https://youtu.be/jVp6FUsLPDY.

COMPLAINT

Construction ("DDC"), New York City Department Of Cultural Affairs ("DCA"), New York City Department Of Correction ("DOC"), New York City Public Design Commission ("PDC"), (together, "Defendants"), respectfully allege as follows on their own knowledge with respect to their own actions, and upon information and belief as to all other allegations:

## JURISDICTION AND VENUE

11.     This court has jurisdiction over this declaratory judgment action pursuant to 28 U.S.C. §§ 1331 and 1338(a), in that this action arises under the Visual Artists Rights Act, 17 U.S.C. §106A, et seq.

12.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

13.     This court also has jurisdiction of the Second claim under the principles of supplemental jurisdiction pursuant to 28 U.S.C. §1367.

14.     Venue is proper in this court pursuant to 28 U.S.C. §1391, in that the property that is the subject of this action is situated in this district.

## JURY DEMAND

15.     Plaintiffs demand trial by jury in this action on each and every one of their claims.

## THE PARTIES

16.     Plaintiff Snyder resides in New York, New York, and is a professional artist.  Plaintiff Snyder is the "author of a work of visual art" within the meaning of 17 U.S.C. § 106A.

17.     Plaintiff Haas resides in Yonkers, New York, and is a professional artist. Plaintiff Haas has a second residence in New York, NY.  Plaintiff Haas is the "author of a work of visual art" within the meaning of 17 U.S.C. § 106A.

18.     Defendant Eric Adams, Mayor of New York City, in his official capacity, is the current mayor of the City of New York.  Mayor Adams is responsible for setting and overseeing the policies of the City and the manner in which they are maintained, applied and enforced. Mayor Adams acted at all times under color of law in the acts attributed to him herein.  Mayor Adams' office is located at 1 City Hall, New York, NY 10007.

19.     Defendant New York City is a municipal entity created and authorized under the laws of the State of New York, with its principal offices located at the Municipal Building, One Centre St., New York, NY 10007.

20.     Defendant New York City Department Of Design And Construction is a department or division of the City, with its principal offices at 3030 Thomson Ave., Long Island City, NY 11101.

21.     Defendant New York City Department Of Cultural Affairs is a department or division of the City, with its principal offices at 31 Chambers St., Ste. 201, New York, NY 10007.

22.     Defendant New York City Department Of Correction is a department or division of the City, with its principal offices at 7520 Astoria Blvd., Ste. 110, East Elmhurst, NY 11370.  Upon information and belief, Defendant DOC has owned the Manhattan Detention Complex, located at 124-125 White Street, New York, New York 10007 ("124-125 White Street") continuously since on or about 1971.

23.     Defendant New York City Public Design Commission is a review agency

of the City, with its principal offices at City Hall, 260 Broadway, Third Floor, New York,

NY 10007.

## FACTUAL BACKGROUND

**A.     The Manhattan Detention Center**

24.     The Manhattan Detention Complex, located at 124-125 White Street,

consists of two buildings designated the North and South Towers, connected by a bridge.

The North Tower was opened in 1990. The South Tower, formerly the Manhattan House

of Detention, or the "Tombs," was opened in 1983, after a complete remodeling.

25.     In October 2019, the New York City Council approved a controversial plan

to replace the Manhattan Detention Complex with the New Facility as part of the

Borough Based Jail ("BBJ") Project.  The project calls for the construction of four new

detention facilities in the Bronx, Brooklyn, Manhattan, and Queens.

26.     The community of Chinatown strongly opposes the City's approval of the

New Facility based on, amongst other things, the immediate and very long term and

wide-ranging impacts on the Chinatown community and the character of the

neighborhood that the New Facility will have, and has already had.  In addition to

significant adverse environmental and cultural impacts on the community, the

construction of the New Facility will cause the permanent closure of the White Street

pedestrian-only public plaza.  This will deprive the neighborhood of light, air, and of a

central pedestrian artery that provides access between Baxter and Centre Streets and

which was constructed for the enjoyment of the public.  Indeed, Mayor Adams himself stated that the planned New Facility in Chinatown is "institutionalized hate."

27.     To add insult to injury, and most pertinent here, the replacement of the Manhattan Detention Complex with the New Facility requires the removal and destruction of important artwork of historical and cultural significance incorporated into the Manhattan Detention Complex by Snyder and Haas.

28.     When the City first constructed the Manhattan Detention Complex, the City promised that White Street between Centre and Baxter Streets would be a pedestrian only public plaza.  The City commissioned artwork for the public space as part of New York City's Percent for Art law, which requires that one percent of the budget for eligible City-funded construction projects be spent on public artwork in public schools, courthouses, day care centers, police precincts, firehouses, hospitals, transportation terminals, detention centers, parks, and other City facilities.  Managed by DCA, the Percent for Art program seeks to commission works by the broadest range of artists that reflect the diversity of New York City.  These projects demonstrate how art, integrated into a site, can enhance civic architecture along with a wide range of public spaces.  As stated on the Department of Cultural Affairs Percent for Art website, "[b]y bringing artists into the design process, the City's civic and community buildings are enriched.[2]

---

[2] Available at:
https://www1.nyc.gov/site/dclapercentforart/index.page#:~:text=The%20Percent%20for%20Art%20Program%20offers%20City%20agencies,civic%20and%20community%20buildings%20are%20enriched.%20Stay%20Connected?msclkid=2eb3efcbc62c11ecb16db8f4097bd720.

COMPLAINT

**B.**     **The Artwork**

29.     In 1985, the New York City Percent for Art Fund awarded Snyder and Haas

the contract for a site-specific public artwork for the Manhattan Detention Complex

North Tower project (the "Artwork"). A copy of the contract between Plaintiffs and

Urbahn & Litchfield Grosfeld, a Joint Venture, on behalf of the City, dated July 2, 1987,

is annexed hereto as **Exhibit A**.

30.     Pursuant to that contract, Snyder and Haas created the Artwork as

independent contractors and not as agents or employees of the City.  Plaintiffs were not

supervised by any employee of the City nor did Plaintiffs exercise supervision over any

employee or official of the City.  *See* **Exhibit A**, at Art. 8.

31.     Neither Snyder nor Haas ever executed or signed any written instrument

specifying that installation of any portion of the Artwork may subject any of those works

of visual art to destruction, distortion, mutilation, or other modification, by reason of its

removal.

32.     The design of the Artwork in the public plaza outside of the Manhattan

Detention Complex was a collaboration between Plaintiff Haas and Plaintiff Snyder.  The

Artwork is located in the public space and walk-way in the area between the North and

the South towers.

33.     Title of the Artwork was transferred to the City of New York after

completion of the Artwork in 1992.  *See* **Exhibit A**, at §§ 1.9, 2.1.

34.     The project was further extended when one panel of Haas' original six-panel installation of his work "Immigration on the Lower East Side of New York" was repainted in 1997.

35.     The Artwork is a work of recognized stature.  The Artwork is viewed as meritorious and is recognized by art experts and other members of the artistic community, and was awarded the Art Commission Award for Excellence in Design in 1988. The artwork depicts the history of the cultures that have inhabited the Lower East Side and the Chinatown area and are of heightened significance and value because of their geographical placement.

**C.     Plaintiff Kit-Yin Snyder**

36.     Snyder, who was born in Guangzhou, China and immigrated to the United States at age 15, has worked as an artist since the 1970s in the area of ceramics.  For several decades, Snyder has produced environmental sculptures, exhibited in New York area sites such as P.S. 1, Artpark, Snug Harbor, and in public spaces such as Bryant Park. In the late 1990s, Snyder began working with the medium of video, allowing her to add yet another 4th dimension to her artwork and the ability to combine visual imagery with story-telling.

37.     During the past five decades, Snyder has made major contributions to the art scene and is known for her environmental art practice.  Snyder has exhibited her work at sites in both the United States and abroad.  Her large-scale steel sculpture in Margaret Mitchel Square, in Atlanta, Georgia continues to provide a space for visitors.  Snyder's filmmaking is also on display in Atlanta, where her debut film, "Double Exposure,"

which explores Snyder's identity as a Chinese American and for which Plaintiff has achieved wide recognition, can be viewed.  Snyder's work and accomplishments have been the topic of news coverage and recognition by the art community.

38.    Snyder has received numerous grants for her work in environmental sculpture, from organizations including the National Endowment for the Arts and the New York Foundation of Arts, as well as awards, including:

2004 – Independent Lens/PBS in the USA screening in 2004
2003 – Tribeca Film Festival screening for Double Exposure
2003 – 26th International Asian American Film Festival screening in New York City
2003 – RAI SAT-ART screening in Italy
2002 – Jerome Foundation and the New York Council on the Arts Grants for the documentary film "Double Exposure"
1993 – Certificate of Merit in Recognition of Outstanding Achievement in the Arts from the New York City Office of the Council President, Andrew Stein
1993 – Yale University Womens Caucus for Art for Outstanding Contributions Made in the Arts
1991 – New York Foundation of Arts ("NYFA") Fellowship
1990 – New York State Council of Art ("NYSCA") grant for "Temple of Jupiter," an outdoor installation at Snug Harbor, Staten Island, NY.
1988 – Excellence in Design, Art Commission, New York City for the White Street Detention Center commission
1987 – Excellence in Design, Atlanta GA, for Margaret Mitchell Square commission
1986 – National Endowment for the Arts ("NEA") Fellowship in Sculpture
1986 – NYFA Fellowship
1986 – Bessie award for set design for Throne Room for The Memory Theater of Julio Camillo at the Brooklyn Anchorage, Creative Time, New York City
1985 – NYSCA grant to build a set for the dancer, Blondell Cummings at the Midtown Whitney Museum, New York City
1983 – Winner of International Water Sculpture Competition, New Orleans World Expedition, LA
1982 – NEA Fellowship in Sculpture
1981 – CAPS Grant in Sculpture, New York Artist in Residence, Bryant Park, Public Art Fund, New York City

1980 – NEA Fellowship in Sculpture[3]

39.     Despite her many accolades, "Justice" remains one of her most prided works.  It was Snyder's opportunity to give back to the community to which she first moved when she immigrated to the United States from China, and to memorialize the plight of so many of other immigrants in the Chinatown community.

**D.     Snyder's Work of Visual Art**

40.     Snyder's portion of the Artwork at the Manhattan Detention Complex, collectively referred to as "Justice" (also sometimes known as "Judgment"), includes a sculpture on the roof of the bridge, entitled "Solomon's Throne," a paving pattern on White Street, entitled "Upright," and seven sculptures on the terrace and sidewalk, entitled "The Seven Columns of the Temple of Wisdom."

41.     The design of the sculptural aspect of the work suggests a portico symbolizing civic justice, while the paving pattern includes Chinese characters for "upright" and "righteousness."  The work conveys a desire of justice for all those being detained in the Manhattan Detention Complex.

---

[3] *See also* https://kit-yin-snyder.com/

COMPLAINT



42.     The central focus of "Solomon's Throne" is the throne of the Old
Testament judge, King Solomon, whose name means "peaceable."  There are six
symbolic steps leading up to the throne to form a pediment along the top of the bridge –
the metaphorical "throne of justice" to link together the North and South towers of the
Manhattan Detention Complex physically and symbolically. This creates a metaphorical
"Bridge of Sighs" that is placed above the passageway leading from the detention center
to the court



43.     "Upright" is a geometric labyrinth of colored pavers, including pictograms of two Chinese characters meaning upright and righteousness, interspersed amongst two rows of apple trees, bordering White Street.  The apple trees were an integral part of Snyder's original design and they are clearly shown on the plan for the commission of the Artwork that was approved by the PDC in December 1988. A copy of original plans for the Artwork, is annexed hereto as **Exhibit B**.  Upon information and belief, the City has already removed the trees.

 



44.     "The Seven Columns of the Temple of Wisdom", consist of a pair of columns leading to the gate (the bridge between the North and South towers of the Manhattan Detention Complex), appropriate for a hall of justice, as well as five

-14-

additional columns at the administrative entrance.  The seven columns represent the

Seven Pillars of Wisdom in the Temple of Solomon, suggesting a portico symbolizing

civic justice.





-15-

### E.   Plaintiff Richard Haas

45.     Plaintiff Richard Haas is a renowned painter and muralist, who has had a long and successful career in both the public and the private sectors of artistic achievement.  Haas is a long time resident of New York and first began painting large-scale murals on exterior walls while living in the City's SoHo neighborhood in the mid-1970s as a response to the widespread construction and urban renewal initiatives that were drastically changing the City's landscape.

46.     Haas' influence in public art can be seen throughout the United States on the walls and in the public spaces of most major cities.  Haas' public works include the Oregon Historical Society in Portland, the main branch of the New York Public Library, the Robert C. Byrd Federal Building and Courthouse in Beckley, West Virginia, and the Sarasota County, Florida Judicial Center.  Along with exhibiting extensively in the United States, Haas has also shown his work abroad in Germany, Japan, and France.  Haas has created fifty three exterior, trompe l'oeil murals throughout the United States and Germany to date.

47.     Haas' works of art serve as significant markers of memory and history within the urban landscape.  Haas' murals strive to mend the visual ailments and aesthetic challenges of urban environments and have been used to address cultural, political, and social issues.

48.     Haas has obtained many distinguished awards, grants, and commissions, including:

2015 – The Clinedinst Award, The Artist Fellowship, Inc., New York, New York, Fifty for Fifty, Arts Westchester.  Honoring 50 artists living and Working in Westchester County
2005 – Jimmy Ernst Award, American Academy of Arts and Letters, New York NY
2003 – Westchester Arts Council Artist Award
2003 – MacDowell  Fellow, Peterboro, New Hampshire
1991 – Distinguished Alumnus Award, University of Wisconsin
1989 – Doris C. Freedman Award
1987 – National Endowment for the Arts
1983 – Guggenheim Fellowship
1977 – New York City Municipal Art Society Award
1977 – American Institute of Architects Medal of Honor

49.     Haas' work and accomplishments have been the topic of news coverage and recognition by the art community.  Despite his many accolades, "Immigration on the Lower East Side of New York" and "The Judgements of Solomon and Pao Kung" remain amongst Haas' most important and preserved works of cultural significance and community value.

**F.     Haas' Work of Visual Art**

50.     Specifically, Haas' portion of the Artwork at the Manhattan Detention Complex includes two sculptural friezes and a seven-paneled mural.

51.     The friezes, entitled "The Judgements of Solomon and Pao Kung," are located on a bridge that connects Baxter and Centre Street.  They were constructed with sculptural epoxy and cast stone, and illustrate King Solomon and Pao Kung, a Sung Dynasty Chinese Judge.  This is a dedication to Chinatown, where the Manhattan Detention Complex is located, and the surrounding judicial institutions as well as the Manhattan Detention Complex.



MEDALLION #1 (SOLOMON)



MEDALLION #2 (PAO KUNG)



MEDALLION #3 (SOLOMON)



MEDALLION #4 (PAO KUNG)

52.     The seven paneled mural, entitled "Immigration on the Lower East Side of New York," is painted directly onto the exterior of the second story of the Manhattan Detention Complex using Keim silicate paint with the intended effect being that the murals appear to be tiles.

53.     "Immigration on the Lower East Side of New York," traces the history of successive waves of immigration in the 19th and 20th century to the Lower East Side and Chinatown.  The work is a timeline of the immigration of various groups to New York City, focusing on everyday struggles rather than heroism.  The panels show changing waves of immigration, beginning with immigrants arriving in steamboats and ending with immigrants descending from an airplane, with the middle panels illustrating the "melting pot" of immigrant communities of the Lower East Side.  There are painful memories of contemporary Lower East Side life throughout the panels.  With the work, Haas intended to illustrate overlapping cultures, at a site adjacent to the immigrant communities of the Lower East Side.  Many immigrant cultures are represented on the works, many with common ties, among them, Jewish, Hispanic, Chinese, and Italian.





54.     The original design for the sixth panel, intended to represent the Hispanic immigrant culture in the neighboring areas near the Manhattan Detention Complex, came under controversy in 1992, and Haas repainted the panel, completing the Artwork in 1997.



PANEL 6 ORIGINAL DESIGN 1992



PANEL 6 REVISED DESIGN 1997

**G.      Defendants' Plan to Remove the Artwork**

55.      As explained above, in demolishing the Manhattan Detention Complex and

replacing it with the Facility as part of the City's BBJ Project, DCA, DDC and DOC have

advanced a removal plan (the "Removal Plan") for the Artwork, which the PDC has

approved.

56.      However, the Artwork has been incorporated in and made part of 124-125

White Street in such a way that removing it, or any part thereof, from 124-125 White

Street would cause its destruction, distortion, mutilation or modification.

57.      Upon information and belief, the removal of the Artwork is scheduled to

commence in May 2022.

58.      The Removal Plan improperly treats each portion of the Artwork as a

separate piece and makes no provision for reuniting the different pieces of the Artwork at

a later date.

59.      Even worse, the Removal Plan will completely destroy two portions of the

Artwork.

60.      Specifically, the Removal Plan contemplates that the works "Upright" and

"Immigration on the Lower East Side" "cannot be salvaged."

61.      The Removal Plan proposes to: (1) document the existing installation of the

Artwork; (2) store representative samples of the original materials for reference on

Riker's Island for an indefinite period of time; and (3) recreate the Artwork in new

materials, at the New Facility "or at an alternative site, in consultation with artist" [*sic*]. A

copy of the Removal Plan as presented to the PDC on February 14, 2022, is annexed

COMPLAINT

hereto as **Exhibit C**.  A copy of the Removal Plan as presented to the PDC on April 11, 2022, is annexed hereto as **Exhibit D**. To date, no "alternative site" has been proposed.

62.     Pursuant to the Removal Plan, Snyder's "Upright," and Haas' "Immigration on the Lower East Side of New York" will be destroyed.  The Removal Plan proposes the destruction of the original materials of the works, and accounts only for documentation and reproduction of the Artwork in changed media.  After 124-125 White Street is demolished, nothing will remain of the destroyed Artwork except photos taken of the Artwork as part of the documentation process proposed by the Removal Plan.  The permanent reproduction of the Artwork as contemplated by the Removal Plan is vague and provides no real plan for meaningful "consultation" with the artists that can likely take place during their lifespans.

63.     With the other portions of the Artwork, the Removal Plan contemplates storing the Artwork for an unstated period of time on Riker's Island and later reinstalling the salvaged portion of the Artwork at the Facility "or at an alternative site, in consultation with the artist."  Like the works deemed non-salvageable under the Removal Plan, there is no concrete plan in place for consultation with Haas or Snyder, or any future display and public enjoyment of these "salvageable" works.

64.     Neither Snyder nor Haas have agreed to an alternative site for the reinstallation of the salvaged Artwork.  Despite discussions, the City has failed to provide any type of commitment to the artists to preserve the Artwork in its original form or permanently reinstall the Artwork.

65.     The Removal Plan contains no promised date for reinstallation of the salvaged Artwork after storage on Riker's Island.

66.     From December 2021 through February 2022, the DCA, DDC and DOC sought preliminary review of the Removal Plan from the PDC.  Public PDC hearings on the Removal Plan were held on February 14, 2022 and April 11, 2022.

67.     During the public hearings, Snyder expressed her disapproval of the Removal Plan.  In particular, she expressed that the Removal Plan says very little about the artist themselves, despite the importance of the artists behind the Artwork. Additionally, other individuals spoke regarding Snyder and Haas' rights under VARA.

68.     At the February 14, 2022 PDC hearing, the PDC discussed that re-installation of the works will be considered at an alternative site, however, the DCA, DDC and DOC representatives presenting the Removal Plan were unable to provide any proposals for an alternative site, and admitted that while other locations in Chinatown are being researched, no location has been chosen.  Moreover, while acknowledging that the Removal Plan "cannot work without the artists being part of the process," the representatives proposed that other alternative locations for the Artwork will be considered after the destruction of the Artwork has already commenced.  This vague proposal provides for no definite re-installation of the Artwork that will be accomplished during the lifespans of Haas or Snyder.  Based on these concerns, the PDC rejected the Removal Plan at the February hearing, stating that:

> "The Commission expresses support and respect for the artist
> and their work and is disheartened by the lack of maintenance
> for all the artworks at the site. The Commission acknowledges

the infeasibility of salvaging the existing artwork, which is painted directly onto the building's exterior wall, but notes the importance of preserving artworks that represent immigrants and people of color as part of the history of New York City.

A copy of the minutes from the February 14, 2022 PDC Hearing and the April 11, 2022 PDC hearing, is annexed hereto as **Exhibit E**.

69.     When the Removal Plan was again presented to the PDC on April 11, 2022, the DCA, DDC and DOC representatives presenting the plan still could not provide a definitive plan for reinstallation or reproductions of the Artwork.  The Removal Plan proposes to:

> "*Plan* to recreate artworks, at the new BBJ MN Facility *or an alternative location*, in consultation with artist; Selected Design-Builder for BBJ MN Facility will study and propose placement options to recreate artworks; May propose to modify scale and/or materials of recreated artworks to integrate with new context if approved by artists; Design team will consult with artists regarding the treatment, display, siting, and installation of their artworks throughout the course of the BBJ MN Facility project; Design services and site preparation for the installation or recreation of artworks will be provided by Design-Builder."

*See* **Exhibit D** (emphasis added).

70.     The Removal Plan as presented at the April PDC hearing continued to present vague promises of "reinstallation or reproductions" of the Artwork without setting forth any additional concrete proposals to ensure consultation with the artists during their respective lifespans.

71.     Nevertheless, on April 11, 2022, the PDC unanimously approved the Removal Plan.  One member's approval of the plan included compliments that the

COMPLAINT

Removal Plan included consultation with Snyder and Haas, despite no commitment to reinstall the Artwork timely or even to reinstall it at a specific location.

72.     Neither Snyder nor Haas executed or signed a written instrument after VARA's effective date, June 1 1991, with any Defendant that specifies that installation of the work may subject the work to destruction, distortion, mutilation, or other modification, by reason of its removal from 124-125 White Street.

73.     The "consultation" with Snyder and Haas promised in the Removal Plan has not been pursued as promised.  To date, no substantive commitment has been made to Snyder or Haas ensuring the details of the preservation and reinstallation of the original Artwork and the artists' visions behind the Artwork.

## FIRST CLAIM
### (Visual Artists Rights Act)

74.     Plaintiffs reallege all paragraphs above as if fully set forth herein.

75.     The Artwork is a "work of visual art" within the meaning of 17 U.S.C. § 101, and constitutes copyrightable subject matter.

76.     The Artwork is not a "work made for hire" within the meaning of 17 U.S.C § 101.  Plaintiffs created the Artwork as independent contractors and not as agents or employees of the City.  Plaintiffs were not supervised by any employee of the City nor did Plaintiffs exercise supervision over any employee or official of the City.  *See* **Exhibit A**, at Art. 8.

77.     Plaintiff Snyder's work "Justice" is a "work of visual art" within the meaning of 17 U.S.C. § 101, and constitutes copyrightable subject matter.

78.     Plaintiff Haas' work "Immigration on the Lower East Side of New York" and  is a "work of visual art" within the meaning of 17 U.S.C. § 101, and constitutes copyrightable subject matter.

79.     Plaintiffs' honor and reputation as artists will be damaged if Defendants act on the City's stated intentions to demolish 124-125 White Street .

80.     The Artwork has received wide public acclaim and approval.

81.     The Artwork is a work of recognized stature.

82.     Plaintiff Snyder's work of visual art, "Justice" is a work of recognized stature.

83.     Plaintiff Haas' work of visual art, "Immigration on the Lower East Side of New York" is a work of recognized stature.

84.     Plaintiffs will be irreparably harmed if their works of visual art are distorted, mutilated, modified or destroyed without their consent.

85.     Any intentional distortion, mutilation, modification or destruction of Plaintiffs' works of visual art would be prejudicial to Plaintiffs' honor and reputation.

86.     Plaintiff Snyder's work of visual art, "Upright," has not been incorporated in or made part of a building.

87.     Plaintiff Snyder's work of visual art, "Upright," has been incorporated in and made part of the public plaza adjacent to 124-125 White Street in such a way that removing the work of visual art, or any part thereof, from the public plaza would cause the work's destruction, distortion, mutilation or modification.

88.     Plaintiff Haas' work of visual art, "Immigration on the Lower East Side of New York," has been incorporated on and made part of 124-125 White Street in such a way that removing the work of visual art, or any part thereof, from 124-125 White Street would cause the work's destruction, distortion, mutilation or modification.

89.     Plaintiffs did not consent to installation of the works in and around 124-125 White Street specifying that installation in the building may subject their works to destruction, distortion, mutilation, or other modification, by reason of their removal, before June 1, 1991.  To the contrary, prior to the Plaintiffs installing the Artwork, the City specifically represented, assured, and agreed to the Plaintiffs that it would "not intentionally destroy, damage, alter, modify or change the Art Work in any way…." *See* **Exhibit A**, at § 7.4.

90.     Plaintiffs have not executed or signed a written instrument after VARA's effective date, June 1 1991, that is signed by any Defendant and that specifies that installation of the works may subject the works to destruction, distortion, mutilation, or other modification, by reason of their removal from 124-125 White Street.

91.     Pursuant to 17 U.S.C. §106A(d)(3), Plaintiffs have the right to prevent such destruction, distortion, mutilation or modification to their works of visual art for a term consisting of the duration of their respective lives.

92.     Plaintiffs and the community will suffer irreparable harm if the Artwork is removed pursuant to the Removal Plan.

93.     Plaintiffs have no adequate remedy at law.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE,** Plaintiffs respectfully pray that this Court enter judgment in their favor and against Defendants as follows:

A.      granting a preliminary and permanent injunction barring Defendants, their agents, attorneys and employees and all those acting in concert with it, from taking any alter, deface, modify, mutilate, destroy, distort and/or demolish Plaintiffs' works of visual art at 124-125 White Street; and

B.      declaring that Plaintiffs have the right pursuant to 17  U.S.C. § 106A(d)(3) to prevent any intentional destruction, distortion, mutilation, or other modification of each of their individual works of visual art for a period consisting of their individual lifetimes; and

C.      awarding Plaintiffs their costs and expenses, including attorneys' fees, to the full extent allowed by law, including under Visual Artists Rights Act, 17 U.S.C. §§101, et seq.; and

D.      Entering such other and further relief as the Court deems just, proper and equitable under the circumstances.

Dated:  May 11, 2022

Respectfully submitted,

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


By      _/s/ Robert S. Friedman_
             ROBERT S. FRIEDMAN
             DANIEL BROWN
             EMILY D. ANDERSON
             SARAH ABERG
             CHLOE CHUNG (_pro hac application forthcoming_)

30 Rockefeller Plaza
New York, New York 10112
Telephone:  (212) 653-8700

_Attorneys for Plaintiffs_
_KIT-YIN SNYDER AND RICHARD HAAS_